All right, final case this morning is Evanston Insurance versus, is it Agape? Agape. Agape. Okay, Agape Senior Primary Care. All right, Mr. Fields. Thank you, Your Honor. May it please the court, my name is Paul Fields and I represent the appellate in this matter, Evanston Insurance Company. Your Honor, this matter arises from an individual named Ernest Addo who fraudulently assumed the identity of another doctor, Dr. Arthur Kennedy. Where is he today? Dr. Addo, our understanding is... Is he incarcerated? He is not, Your Honor. Okay. Our understanding is he is living outside of Atlanta. It's the last that I heard. It's irrelevant. I was just curious. Your Honor, why he's not is another good question as well. Dr. Addo was hired by Agape Senior Primary Care in practice medicine for the appellate. Now, Agape Senior Primary Care employs physicians and nurses and they basically staff numerous facilities which they have, including hospices, nursing homes, things of that nature. They practice a method in the treatment called integration of services. That's set forth in both parties' briefs. It's acknowledged. And essentially, that means that you do not see one single physician, but there will be numerous physicians that you will see in the course of treatment. Which is very important because in this instance, the purported Dr. Kennedy, Mr. Addo, saw patients at the same time there were other physicians who were seeing the patients. Now, my clients issued a physician's professional liability insurance policy and it included 12 physicians as well as Agape Senior Primary Care and additionally some nurses. Mr. Addo fraudulently, and I think all parties agree that this occurred fraudulently, submitted an application in which he signed Dr. Kennedy's name to the application and thus was named insured under the policy. The district court found that there was no coverage for Dr. Addo, Mr. Addo, Dr. Kennedy because he had fraudulently misrepresented the application for insurance, his status as a licensed physician. But the district court also found that it did not find that the entire policy that was issued was void. Instead, it left in place insurance coverage for the remaining physicians and Agape Senior Primary Care. Let me ask you, in the South Carolina law, to rescind an entire policy, you would need fraud and the inducement of some kind, knowledge by the applicant, wouldn't you? Yes, Your Honor. And in this case, let's take the situation where Agape is sued as a participant in a malpractice case against Mr. Cripps, Dr. Cripps, say. Yes, Your Honor. They're the applicant. They didn't misstate anything and they didn't have knowledge of any falsity, did they? Your Honor, no one contends that Agape intentionally misstated that Mr. Addo was a physician. So we have a policy where we have numerous applicants, the doctors and Agape itself, Agape itself, submitting an application. And Agape's application was not fraudulent and wouldn't lead to rescission. The argument you make is that the doctor's application was fraudulent and therefore entitles you to rescind. And your argument is that therefore you're going to deny Agape coverage and Dr. Cripps coverage because of the one applicant who did have knowledge. Your Honor, that's correct. And so I guess that, does that seem a little harsh to have somebody who's totally innocent, pays a premium, submits his applications, happens to have a doctor on board who's a fraud, they didn't know it, and to vitiate its entire policy? Your Honor, whether it seems harsh or not, I think that's the only result that can happen here. I know that's your position. Well, it's not the only result. There are cases that sort of go all over the place. And I think that what Judge Niemeyer said is really sort of the point that moves me the most, because what you're doing by refusing to provide a defense for totally innocent people is not only innocent applicants, innocent other doctors, but also the people that are suing them. It's still another step removed. They don't have any basis for recovery in insurance because of something they had no knowledge of, no connection with. I would like to make three points, if I may, in response to that. First, we are defending. Evanston has provided a defense to Agape senior primary care physicians. And all the doctors. And the doctors that have been sued. Yes, that has occurred. And that's going to continue. This suit doesn't have anything to do with that. No, we've provided a defense and asked the court to declare our rights and obligations. Right, so you don't want to provide a defense. I understand you're doing it now. Yes, Your Honor. That doesn't get you home in the future. That's correct, Your Honor, because the second point is... You're not saying to me we're willing to provide a defense. We're saying we don't think we have an obligation under the policy to provide a defense. I understand, but then are you also saying that we're going to? No, Your Honor. If this honor were to avoid, if this court were to avoid the policy, ab initio, we would contend that there would be no need for a defense. If you think of... I'm very sympathetic to an insurance company assessing risk and having it receive a premium commensurate with the risk. And it received premiums from innocent applicants. This is not the case where the sole applicant committed the fraud. This is where we have multiple applicants, and all of them are innocent except for Ida, who's fraudulent. And the risk you assumed was the malpractice of all these doctors and nurses who were innocent,  that was part of the risk you assumed for which you received a premium. You did not assume the risk for someone who committed a fraud on you, which is everything related to Ida or Dr. Kennedy, however you want to refer to them. And I think fairly you shouldn't, and the court even went so far as to say even the negligence of Agape, which would ordinarily be covered, is not going to be covered because it relates to Ida. But the court did say that you should defend and answer for a judgment with respect to Cribs or a nurse or Agape itself with respect to other transactions. And it seems to me really focusing on the risk, you're asking for somewhat of a windfall on this, aren't you? I guess your argument would be you're going to return the premium. Yes, Your Honor. And so that's fair. That's a good response, but they also wanted to have the coverage and thought they had the coverage and acted in a manner that justified their coverage, at least Agape and the other doctors and nurses. Your Honor, the difficulty with this is, and this is a real-life situation, if there are suits against Dr. Cribs and suits that name Dr. Cribs and Dr. Otto and Agape senior primary care, how do you parse out the difference? Well, that's another problem. And it looks to me like the court was with you on that type of thing, and that probably would have to arise. But the court did not impose any responsibility for protecting any party with respect to conduct involving Otto, both imputed conduct, agency, negligent hiring, malpractice. Anything to do with Otto, I think the court declared, as I understand it, there's no coverage. Yeah, I think the court's order in some ways is not the clearest. I understand your problem on that, but we can't here adjudicate coverages for all the hypothetical things that can come up. I think we can address the general principles, whether you're entitled to vitiate the policy based on the one applicant's fraud when there are other applicants. That's really the issue, I think. And after that, I think the parties in the lower court are going to have to work it out as to how things go. Either we vitiate or we don't. Vitiate the entire policy, or just the coverages that the district court applied. I think we do better in addressing that issue. Because I think it's a complex issue, and I think your points are pretty serious points. The question really is sort of, can we fracture a policy in a certain sense? But it seems to me courts have been doing that, at least in the interest of equity in a certain sense, haven't they? Your Honor, I think the majority rule is they did not. The most recent case, and it was cited in the district court's order, decided a case from Illinois, and there is a recent case. Illinois has a strict liability, you don't need knowledge. In other words, if there's a misrepresentation, regardless of whether the applicant knew of it, you can vitiate. Whereas South Carolina requires a common law fraud standard that you have to acknowledge, isn't that right? Your Honor, South Carolina essentially has a very high standard terms and policies. We agree with that. And you satisfy it with respect to Otto, the district court found that. And I think the real question that's before us, the Dyson question, is how far does he infect the policy? How broad is the cancer that we have to carve out? Or you say you can't carve it out, so we have to vitiate the whole policy. And it just, there is a, as you can understand, there is a deep equitable concern in going as far as you want on this, but you can address that. Well, Your Honor, I don't dispute the fact that there's a deep equitable concern. And I fully understand that. I've also been in situations involving this matter where you have an opposing counsel in an underlying case. There's heat here because of Dr. Adda. We're going to get that in front of the jury, and that means we're going to get a really big verdict. You can't parse that out if you're providing coverage for Agape Senior Primary Care and Dr. Cribs. There's no way to determine what is covered and what is not covered because of the integration of services, everyone, Dr. Cribs may have seen. Well, that's a pragmatic matter, and I think that can be handled. I mean, number one, you can handle it. You can have the district court go back and say we have a suit where the defendant is Dr. A. and Dr. Kennedy, and we are denying coverage because the jury can't, there's going to be imputed knowledge, and we have no obligation to cover Kennedy. You may have a good case not to provide coverage in that situation, but we can't hypothesize all these that can rise. Your argument, I guess, is a serious pragmatic one because on a given day one doctor treats, and on another day maybe a doctor fills in or covers while he's not there. I guess that's what you're saying, isn't it? Yes, Your Honor. My guess is what the district court was saying. If Dr. Addo is part of the malpractice, you're probably going to be protected from having to provide coverage, but that's speculative. I'm just reading between the lines because it looked to me like the district judge was sensitive to your argument of getting out all the infected area. I think that with all due respect to the district court, I think the order that came down that he issued was defective in a couple of ways, and it probably was not as clear. If I may just take my last minute and a half and just raise the other three points. The last point you raised, or one of the points you raised, I'll go to the fourth point, which is we asked for a declaration as to rights and obligations under certain policies, and we were not given that under certain situations. We were given that, and in particular, the Hanna class action lawsuit that was filed, which essentially just alleged administrative failures. It did not allege specific acts of malpractice, but respondent superior or things of that nature, and I think the district court, in its decision, did not reach the fact, did not recognize the fact that this is not a general liability insurance policy. It is a professional indemnity insurance policy, and so it did not, in issuing its order, did not make clear that it only covers allegations of professional negligence, not general liability like respondent superior. With this... Go ahead. No, go ahead. I was just going to say, with this policy, set aside Dr. Kennedy, and you had a doctor who committed malpractice, and the one count of the complaint says that Agape was negligent in hiring this doctor because he's had numerous occasions where he has committed malpractice. Would that be covered for the defense of Agape? Well, you would certainly provide a defense if there was an allegation of malpractice. A verdict that included that. Would you cover it? I think we would, Your Honor, since it's relating to the professional liability, but if you're talking about Agape Senior Primary Care was negligent because... Excuse me, my time is up, Your Honors, but if I may finish my thought. Yeah, finish your thought. Agape Senior Primary Care was negligent because it did not check on his... It didn't check on his hiring application or his status. But that's exactly the hypothetical that Judge Neumeyer just gave you. There was negligence, not this, not Otto, somebody else, Joe Schmo. There was negligence when Agape hired the person, because that's the assertion anyway, because he had all these prior malpractice cases. So then he sued under your policy, and Judge Neumeyer asked you if you would cover that, and I think you said yes. I think we would cover, we would provide a defense, certainly for the malpractice. You certainly said that, and then I thought you said, and I think we also would provide... But we would only provide coverage as to the situation that arose out of the professional malpractice that he committed, and that is endorsement number five to the policy, which makes clear... Well, the plaintiff wants to get some money out of Agape, too, so that while there's only one injury, they say that injury also flows from the fact that Agape negligently hired the doctor because of his previous claims. And, Your Honor, we would continue... You would answer that judgment, wouldn't you? Your Honor, we would look to the general liability insurer who would provide coverage for the negligent hiring, not for the professional identity, which Agape has. They have general liability insurance coverage for just general acts of negligence, not for the... I understand that distinction. It's a little bit like legislating now for future cases, and, of course, the courts enjoy the role of looking in hindsight and adjudicating what happened. The declaratory judgment action, of course, is forward-looking as is injunctions, as are injunctions, but I think we have to be mighty careful on how we legislate forward-looking until we see a problem. You guys are clever. You can figure that out if you get the general principles, I think. Your Honor, there have been disagreements. That's why you're here, I guess. Mistakes, everything. All right, Mr. Blake. May it please the Court. Thank you, Your Honors. My name is Sean Blake, and I'm here for all the appellees, including Agape Senior Primary Care. Scott Middleton, who is the principal of Agape, he's the primary owner of Agape Senior Primary Care, and Dr. Cribs and nurse practitioner Nixon are also appellees. What about that negligent hiring claim? So I think the devil's in the details. If you label something negligent hiring on its face, it sounds administrative, but you have to look into the actual allegations. Well, stick with that, just for the hypothetical. I gather you agree that if it's negligent hiring, it'd be under the general liability clause. I agree that negligent hiring in and of itself, the selection of a doctor is not the practice of medicine. And so a truly negligent hiring claim, solely related to that activity, certainly is not something covered by a professional practice. The trouble we get into, and I'm referring specifically to the Hanna-Kloss action, because it's one of the three complaints that are actually in the record from which a coverage determination could be made, is that there's negligent supervision, negligent retention. And when you look in the specific paragraphs inside those causes of action, there's allegations by the plaintiff, the Hanna estate, that the physicians and the employees of Agape failed to, there's a very specific language, reasonably monitor, oversee, supervise, review, examine, control, test, reasonably inquire. Some of those words are actually the practice of medicine, which corporations in South Carolina do not do. Agape, through its employed physicians and nurse practitioners, conducts those types of activities through its integration of services model, which has been described. And so even though the label of the cause of action may sound administrative, the court actually has to look into the substance of the claims to determine the coverage applied there. What do you understand the district court did in this case with respect to these cases? The individual cases. So I think that Judge Anderson struggled initially with how to deal with these. Should he deal with them on a class basis, should he not? He ultimately decided he was not going to make a class-wide ruling. There was a motion for class certification that was denied. That order's not on appeal before the court. And I think what happened next is that, I think there's a failure to prosecute, frankly, the individual claims. There's a lot of ripeness issues. Of the eight that are identified in the declaratory judgment action, five were not in suit at the time of the summary judgment. There was not a complaint for him to even rule upon. So I think he was correct in not delving into the substance of the coverage. Did he address any of those suits? I think he addressed the Larimer suit with respect to the medical director exclusion, which is not on appeal before the court. This is the very last portion of the court's order. He didn't otherwise make a case-by-case ruling in the Hanna case, the Curtis case, or the Larimer case about what portions of the complaints are actually covered. I think what he instead set out to do is, I'm going to tell you based on how, I'm going to construe this policy for you. And then as these situations ripen, we'll rule on them on a case-by-case basis. Is he keeping, is he the trial judge in all these cases? Judge Anderson is not the trial judge on the underlying claims. The underlying claims are state court claims. Initially, Judge Anderson was actually on the Hanna class action. And there haven't been separate declaratory judgment actions filed? There have not been separate declaratory actions filed. Will Judge Anderson have jurisdiction over these issues if they come up, or do you have to file new lawsuits? I think that for some of these that have been raised, there can be an amendment of pleadings to bring them under jurisdiction. I think there's a technical problem with Larimer and with Curtis, and that is those parties, those individual claimants, are named as defendants in this action, but have yet to be brought in as parties to it. They were never served process. And so we argued down below, and it's in my briefs here, that, again, there's a ripeness issue when we ask the court to make specific declarations on specific pleadings against parties who are not yet brought in to declaratory judgment. If we issue a mandate in this case which does not involve remanding, would you think that ends the case? I would think that that would... So that Judge Anderson, the only way he would get involved again is with another claim on lawsuit declaratory judgment action. I think that would be procedurally challenging. I think in some way... What would be procedurally challenging? Getting involved again, or us entering that mandate? You entering the mandate, but without there being any specific rulings on the underlying coverage? No, no, no, no, that wasn't the question. Okay, I'm sorry. My question basically is if, just hypothetically, it's a totally hypothetical thing, I'm not asking you. Say we just affirm. Does that end the case? Or does Judge Anderson have an ability in the structure of the case to... We have a final judgment from Judge Anderson, don't we? We do. There's nothing more for him to do in this case. There's not as the case is postured. So if an issue came up in one of these underlying cases that was dicey, there would have to be another complaint. I would think that the insurer, that Evanson, could bring the action back in front of, under the judge's order, and ask the judge for some type of reconsideration or clarification on the order, when these claims are ripe for consideration. But we're positing to you there's this order now, final judgment. We affirm, final judgment. Can the insurer then come back? Or does he have to bring a whole new claim? I think the insurer would have to bring a new claim in this instance. Okay. So if I may just briefly, I think the court has hit on all the issues regarding to the innocent co-insured doctrine. And I would just like to draw the court's attention that I believe Judge Anderson did precisely what he was required to do in an action for rescission, which is to balance the equities. And I think it's telling in the McCracken case that the South Carolina court specifically stressed twice. Well, his dramatic aspect of his ruling, the drama, is providing coverage for some but not all. In other words, when you have fraud in the inducement of an applicant, does that spread and infect the whole policy? And clearly, if you have one applicant, it does. So here we have multiple applicants providing information on which the insurance company relies. And one of the persons commits material fraud, but not as to a lot of other risks. What's the remedy? And the district judge sort of broke the policy up and said, you provide coverage for some but not all. And I think that is exactly the correct thing to do, which is why there's no cross-appeal on the limitations that he did put on these policies. I think removing coverage from ADDO or for actions of ADDO for agape senior primary care is the coverage to be insured is the proper way to handle that. It was consistent with the New Jersey court decision in Lawson where the court found that it was unfair to the innocent law partners to lose their coverage, and it was unfair to their clients to lose the benefit of an insurance policy to sue against because somebody else... Well, clearly it's unfair to agape,  It is entitled to issue these policies without relying on accurate information. And this candidate has really provoked a lot of litigation and exposure. I think that's fair. I think Judge Anderson correctly looked at the structure of the policy and the application process to determine whether or not the parties reasonably contemplated that there would be co-insurers and the concept of co-insurance throughout their policy. First, the applications themselves were individually signed, individually performed. Notably, on the prior policy period, Dr. Kennedy and Mr. Adams were added mid-policy term on a separate endorsement in the middle of it by his own application. And what Judge Anderson looked at in this case is that there are 13 separate applications, and so there's no dispute that there's co-applicants. There's also co-coverage. Whenever you look at endorsement six of the policy, Judge Anderson was persuaded by the fact that there's different coverage periods and different times given to different physicians. And so the policy itself contemplates that there will be periods of coverage for one insurer, not the other, and it was underwritten on that basis. And I think that those two facts combined to make Judge Anderson comfortable with the fact that because the insurer contemplated co-insurance, yet failed to include in the policy the type of language that would allow a voiding of the policy on the action of one co-insurer and not another, that that weighed into that equitable analysis. I think his order makes clear that had that language existed in the policy, this would be a different case. Had Evanston had language in its policy that said an act of fraud by one insurer initiates a policy, even asked the different co-insurers, then I think Judge Anderson would have said under South Carolina law, it would enforce that. And South Carolina court says the same thing in McCracken. It says, in so much as there is a split of authority, we feel at liberty in the absence of contractual provisions and statutes to choose a rule which appeals to our sense of reason and fairness. And then it went on in McCracken to say that the innocent co-insurer would not be liable for the arson of the other co-insured. Do you think that Judge Anderson was able to do that given the condition in the contract that says the insurers agree that the applications will be considered as a single unitary contract? I'm not sure that that's what that language says. It's a three-paragraph notice that appears right before Dr. Kennedy's signature, and it does say it will be made a part of the total policy. However, again, it does not state that the action of a fraud by that signatory will be an imputed fraud to the other parties. And again, when we have a provision in a contract that's clear, an insurance contract, it's going to be strictly construed against the insurer. Well, it's also in the renewal policy itself. Yes, Your Honor, it is in the renewal policy as well. It's the absence of clear languages of what the impact of that fraud is. I believe Judge Anderson, more importantly, found it to be compelling. And so in here, when we look at a balancing of equities, it was the failure of the insurer to protect itself when it had available language it could have easily used to get the result that it's asking for today versus co-insureds who were completely unable to identify the fraud, who did not commit the fraud, to deprive them of the public. I believe when he weighed those two equities, he came to the right balance, consistent with what South Carolina did in McCracken in relying on the New Jersey case and the Maine case that was cited therein. And it was that reliance on the McCracken case that I frankly believe makes the Lawson case significant because South Carolina had shown in McCracken it was willing to follow in New Jersey's footsteps when there was a split of authorities. And the Lawson case clearly is right on point with this and would show that penalizing the innocent co-insurers is the inequitable result. Unless you have other questions on this issue, I'm going to rest because I believe everything else has been addressed. Thank you, Mr. Blake. Mr. Fields? Thank you. First, I would like to address what Judge Locke has noted in the application. The application talks about you combining all the various applications and them being considered as one. So when the carrier was looking at this application, it certainly considered all the various applications for all of the insurers together as one in assessing this risk. And I would argue that the... Well, stick with that for a minute. How does that square with the notion that the policies might have different time periods of coverage for different doctors? Well, certainly different doctors came in at certain points and left and things of that nature because you're covering the doctor while they're there. You're not going to cover a doctor if he's not working for Agape Senior Primary Care as set forth in Endorsement 5, which says you're only liable for their acts when they're working under your control. So if Dr. Cribbs left and started his own practice... Now, when a new doctor comes in, what's the term of coverage for him in terms of time? I believe when Dr. Kennedy-slash-Mr. Addo came in, there was an application that was submitted part-term for the prior policy. I mean, are the policies a year per doctor? Yes, I believe, yes. The policies were for 12 February 2013, or 2012 to 12 February 2013, I believe. OK, so if a doctor came in in December, he would be getting coverage only to February? That's correct, Your Honour. And then there would be a complete renewal application that all the doctors that are there at the time submitted to the carrier, they would look at those... Are there any adjustments of premium based on the time the doctor is there? I think there is, and I think Dr. Mr. Addo only paid a partial premium for the prior policy. I don't think he paid a full premium for that amount of time. Can you give me your view on what we would, if we affirmed here whether you could come into this lawsuit and make additional arguments about... because now the underlying suits have been spinning out, or whether you'd have to bring a whole new declaratory judgment? Your Honour, I don't think... I think it's a final judgment, and that's what Judge Anderson said, was it was a final judgment. Well, of course, we could remand. That's correct, Your Honour. And we would... With directions to do something. Do the parties want us to remand? Your Honour, we would like for this court to reverse and say the policy is void ob initio, and there's no coverage. And one point I do want to address that hasn't been raised is there is also an exclusion, which we think is on point, which is exclusion A, which we believe the district court read improperly, which deals with any violation of law. And I believe the district court... to any malpractice or personal injury committed in violation of any law or ordinance. And then it has a semicolon, and then it goes on to have another phrase. It says, or any claim based upon or arising out of dishonest, fraudulent, criminal, malicious, knowingly wrongful, deliberate, or intentional acts, errors, or omissions committed by or at the direction of the insured. Judge Anderson essentially read where there is a semicolon, after malpractice committed in violation of law or ordinance, semicolon, he read the clause at the direction of the insured into that phrase. It is set forth in our briefing, and we think that was error. So we would like, Your Honors, to reverse and remand and say that there is no coverage because all the actions that were occurred here that are the basis for the Hanna suit, et cetera, were done in violation of the law, regardless of whether the policy is voided ob initio. So how many actions were under consideration when Judge Anderson ruled? There was a Hanna class action. There were, I think, three or four others. And then I will tell the court it's not in the record. There have been many other cases that have been filed because there are advertisements essentially. So what's going to happen with those? Your Honor, those have been... Are you filing a new declaratory judgment action, or do you want this action to cover those? Your Honor, we wanted direction. That's the reason we filed this declaratory judgment action in the beginning, to say what are we supposed to do for these other cases. And bluntly, now we're still defending, and we think... Well, let's just play out a little bit. Let's assume we give you some relief to have the court review with respect to each action. And we... So let's assume there are five new actions that he did not consider. Is this an ongoing process that as... Because I assume actions will continue in the future, and a lawsuit ought to focus on something real that's still here and not speculate about what may come. Well, Your Honor, I think the statute of limitations would be close to running, if I am not mistaken. So there will be a period in which it's cut off. But, yes, there were many... Well, the Hanna-class action... Your Honor, I've passed my time, if I may continue. Go ahead, go ahead. Yes, the Hanna-class action was before Judge Anderson. He then dismissed it, and it's now back in state court. The Hanna-class action doesn't even really allege any act of malpractice whatsoever. At least, it's mainly... Nobody's contending that Dr. Addo did X. Now, there's some other doctors that are being alleged. So it's very, very complicated in all of those situations. I can see it's very complicated, and I think part of the problem for a judicial officer would be history's changing. These things are fluid, and we can't just sort of sit on the sideline and make calls like referees do in a football game. We make one call, and then if something new arises, we have to start again, I think. I'd love to see us have the flexibility to help the parties out as we go. I used to think of that when I was a district judge, and I'd tell them, you have a discovery dispute, just call, and we'd try to get rid of them without a lot of motions and papers. That seemed to work somewhat. But I'm not sure we can do that in this case, where as each lawsuit's filing, oh, yes, this, this. We can't really fault Judge Anderson. As these cases are developing, he's there. It's a difficult scenario, but the one thing that we do find difficulty in is that his order was less than precise, particularly in his use of the term arising out of professional negligence. If you read what he ultimately ruled, he doesn't ever really use those terms, and that's leading the parties some to say, you're covering negligent hiring, you're covering other things that aren't covered, and thus the parties are certainly not comfortable with Judge Anderson's decision that resolves all the issues. Well, your party's not. I think the other parties are just fine with it. That's right. Thank you. Thank you. We will adjourn court for today and come down and re-counsel. This honorable question is adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Paul V. Niemeyer, Diana Gribbon Motz, M. Hannah Lauck